**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 26 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LEE C. ENGLISH,

      Plaintiff-Appellant,

v.

COLORADO DEPARTMENT OF
CORRECTIONS and ARISTEDES
ZAVARAS, in his official capacity,

      Defendants-Appellees.

No. 99-1452

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 97-B-429)**

William S. Finger, Frank & Finger, Evergreen, Colorado, for the Plaintiff-Appellant.

Stacy L. Worthington, Assistant Attorney General (Ken Salazar, Attorney General and A.A. Lee Hegner, Special Counsel, on the brief), Denver, Colorado, for Defendants-Appellees.

Before **EBEL, MCKAY** and **LUCERO**, Circuit Judges.

**EBEL**, Circuit Judge.

      Plaintiff-Appellant Lee C. English ("English") asks the court to reverse the

district court's grant of summary judgment in favor of the Colorado Department

of Corrections and Aristedes Zavaras (collectively "the DOC") with respect to his workplace discrimination claims under 42 U.S.C. §§ 1981, 1983, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a), and 2000e-3(a). The district court dismissed English's claims based on its finding that he failed to proffer direct evidence of discrimination and that he failed to allege evidence supporting a prima facie case of discrimination under the burden-shifting approach first articulated in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802-804 (1973). Although we now hold that English has succeeded in presenting evidence sufficient to make out a prima facie case of discrimination, we hold that he failed to put forth sufficient evidence to show that the DOC's proffered legitimate nondiscriminatory reason for his termination was pretextual, and we therefore AFFIRM the district court's entry of summary judgment on his workplace discrimination claims. However, we REVERSE the district court's order of costs in favor of the DOC under 28 U.S.C. § 1920.

## I. BACKGROUND

English was employed for approximately fourteen years as a guard within the DOC, rising to the rank of Correctional Supervisor at the DOC's Denver Reception and Diagnostic Center ("DRDC") prior to the events giving rise to this case. Several months prior to his termination, English participated in a federal lawsuit alleging systemic racial discrimination by the DOC. The lawsuit resulted

in a settlement requiring the DOC to compensate the plaintiffs and to engage in certain institutional reforms.

English was fired by the DOC in September 1995. Prior to the DOC's action, an inmate at the DRDC named Jacqueline Bowen ("Bowen") alleged that English had twice had sexual relations with her in April 1995, once in an office within the DRDC and a second time in the DRDC's law library. On June 23, 1995, the Chief Investigator of the Department of Corrections assigned Ronny Smith ("Smith") and Annette Fucles ("Fucles") of the DOC's Criminal Investigation Division ("CID") to investigate the allegations. English has presented evidence that this investigative assignment represented a departure from traditional DOC procedures, and that ordinarily Leonard Foster, an African-American assigned as an investigator to the DRDC, would have handled the case.

Smith and Fucles interviewed Bowen and collected samples of the law library carpet which, based on Bowen's interview, they believed might contain semen or other bodily fluids. The investigators also spoke with several female inmates at the DRDC. One inmate said she saw English at the law library at approximately 1 p.m. on one of the dates in question, that he told her he was waiting for Bowen, and that she frequently saw English and Bowen together for about a two-week period. Two other inmates said that English had made sexually suggestive statements to them in the past. In addition, Bowen's cell mate at the

DRDC said Bowen told her in April 1995 that she had sex with English, but that she herself had no first-hand knowledge of their interaction.

Eventually, Smith and Fucles advised the Denver Police Department ("DPD") of their findings, prompting it to initiate a criminal investigation into Bowen's allegations. The DPD conducted serology tests on the carpet swatches and confirmed the presence of semen on one of them. The DPD investigator in charge of the investigation then obtained a court order to draw blood from English for comparison with DNA isolated from the carpet. The DPD found that fluids taken from the carpet were consistent with English and with Bowen, and that the combination of genetic markers identified had an approximate distribution of 1 in 500,000 Caucasians and 1 in 2,000 African-Americans.

In addition, Bowen submitted to two polygraph examinations. The first, which was conducted by the Colorado Bureau of Investigation, suggested that Bowen withheld information when answering two questions about whether her accusations against English were truthful. English alleges that this information was never disclosed to DRDC Superintendent Mark McGoff ("McGoff"), who made the final decision to terminate English, and we assume the truth of his allegation for the purposes of summary judgment. The second polygraph examination was conducted by the DPD, and the examiner concluded that Bowen had been truthful in answering his questions.

On the basis of the evidence set forth above, the Denver District Attorney's office filed criminal sexual assault charges against English in August 1995.[1]

DRDC Superintendent McGoff responded to the allegations first by putting English on administrative suspension pending completion of the CID and DPD investigations. A short time thereafter, McGoff notified English that he had scheduled a disciplinary meeting to review evidence of English's misconduct and to determine whether sanctions were appropriate. English attended two such meetings with his attorney. At the first, McGoff asked English if he could present any information rebutting or mitigating the evidence generated by the investigation. English, through his attorney, declined to make any statements explaining his position because of the pending criminal charges, and instead requested additional information about the evidence against him. At the second, McGoff provided the requested information and the parties debated its relevance and reliability. At that time, English offered to accept an unpaid leave of absence while he attempted to disprove the charges against him. This offer was refused.

English argues that the conduct of the investigation and a climate of racial intolerance which prevailed at the DRDC demonstrate that his termination was caused by racial discrimination. He notes that other African Americans at the

---

[1] English was apparently never prosecuted under these charges, but their ultimate disposition is unclear from the record.

DRDC received racial insults from co-workers and perceived an insensitivity to racial issues on the part of DRDC managers, including McGoff. At least one other participant in the prior discrimination lawsuit alleged that he was "blackballed and denied promotion" after it settled. Moreover, English points to numerous alleged inconsistencies and holes in the investigation against him. For example, English alleges that: (1) the investigators never spoke with him personally to get his version of events; (2) there are no records of him ever being alone with Bowen; (3) the investigators did not attempt to discover the identity of one potential witness; (4) had investigators checked, they would have learned that Bowen's description of his genitalia was inaccurate; (5) no attempt was made to determine whether English had access to a key to the law library; and (6) investigators did not inform McGoff that the first polygraph examination indicated Bowen was not being truthful.[2]

In addition, English points to circumstantial evidence that the investigation itself was conducted in a racially biased manner. To begin with, English infers

___

[2]Although English does not allege that he brought these deficiencies to McGoff's attention during the meetings leading to his termination, McGoff states in his affidavit that they "discussed the relevance and applicability" of documentary evidence against him. In reviewing an order of summary judgment, we draw all reasonable inferences from the evidence in favor of the plaintiff in reviewing an order of summary judgment, and therefore we will presume McGoff was aware of these points at the time he made his decision to terminate English. See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).

that Foster, the African-American investigator based at the DRDC, was prevented from investigating this case so that other, biased investigators controlled by the DOC's central office could be assigned in his stead. Foster stated in his affidavit that he would have been assigned to the case in the routine course of events, but that his supervisor refused to do so because of the potential for conflicts of interest, despite the fact that he and English had only a "distant and neutral" relationship.[3] Further, he asserts that the investigation was unusual because the DOC routinely drops investigations after an inmate fails a polygraph examination. Foster also states that the investigators' failure to get English's version of events was highly unusual, and that the DOC trained him to view obvious lapses in investigatory procedure as evidence of possible bias. Moreover, Foster alleges the DOC had targeted black employees with false complaints of misconduct in the past.

Finally, Foster says he knows of at least one instance in which a white female employee who was charged with having an inappropriate relationship with an inmate was not terminated or severely disciplined. McGoff, in his affidavit, responds by noting that he is aware of three white female employees of the DRDC who were accused of having a sexual relationship with a prisoner during his

_____

[3]We note that Foster was a plaintiff, along with English, in the prior discrimination suit filed against the DOC.

tenure, and that one was terminated and one resigned before disciplinary proceedings commenced against her. The third – a woman alleged to have kissed an inmate, to have sent money to an inmate, and to have met an inmate in a park – was investigated for approximately a year, but McGoff says he ultimately decided there was insufficient evidence to warrant disciplinary action.

English filed suit against the DOC alleging that it had retaliated against him for engaging in protected opposition to racial discrimination in violation of 42 U.S.C. § 2000e-3(a), and that it had intentionally discriminated against him on the basis of race in violation of 42 U.S.C. §§ 1981, 1983, and 2000e-2(a). The district court granted the DOC's motion for summary judgment on December 17, 1998, on each of English's claims. The district court subsequently granted the DOC's motion for costs and attorney's fees pursuant to 42 U.S.C. § 1988, but later revised its order to limit English's obligation to paying the DOC's court costs under 28 U.S.C. § 1920. On October 1, 1999, English appealed, challenging the district court's entry of summary judgment and its award of costs against him.

## II. STANDARD OF REVIEW

The district court had jurisdiction pursuant to 42 U.S.C. § 2000e-5 and 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). This Court has jurisdiction over a final judgment from the district court pursuant to 28 U.S.C. § 1291.

> We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court. Summary

judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.

Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999) (citation omitted). "'[W]here the non moving party will bear the burden of proof at trial on a dispositive issue' that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order to survive summary judgment." McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

## III. DISCUSSION

A.    McDonnell Douglas Burden Shifting Approach in Title VII, § 1981 and § 1983 Claims

English does not dispute the district court's holding that he did not put forth sufficient direct evidence of discrimination to survive summary judgment. We therefore review his case for indirect evidence of racial discrimination under the burden-shifting approach established by McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802 (1973). See, e.g., Texas Dep't of Community Affairs v.

Burdine, 450 U.S. 248, 254-56 (1981); Kendrick v. Penske Transp. Svc., 220 F.3d 1220, 1225-26 (10th Cir. 2000); Perry v. Woodward, 199 F.3d 1126, 1135 (10th Cir. 1999). "While McDonnell Douglas involved a Title VII claim for failure to hire, the analytical framework it pioneered applies equally to claims brought pursuant to section 1981," as well as to § 1983 claims based on allegations of racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. Kendrick, 220 F.3d at 1226 & n.4; see also Reynolds v. Sch. Dist. No. 1, 69 F.3d 1523, 1536 (10th Cir. 1995). Therefore, although English's Title VII, § 1981 and § 1983 claims rest on separate legal foundations, we review the sufficiency of his evidence of intentional discrimination for each under the McDonnell Douglas standard.

In order to survive summary judgment, a plaintiff relying on McDonnell Douglas bears an initial burden of establishing a prima facie case intended to eliminate the most common nondiscriminatory reasons that might account for the adverse employment action. See, e.g., Burdine, 450 U.S. at 252-53. Once the plaintiff has established a prima facie case, the burden then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for taking an adverse employment action against the plaintiff. McDonnell Douglas, 411 U.S. at 802. If the defendant successfully meets its burden of production, the burden shifts back to the plaintiff to put forth evidence sufficient to allow a jury to find

that the defendant's reason is pretextual, e.g., that it is unworthy of belief. See id. at 804.

English argues that the district court erred in finding that he had not met his burden of establishing a prima facie case because he had not demonstrated by a preponderance of the evidence that nonprotected, similarly situated DOC employees were treated differently for committing similar infractions. In Kendrick, we recently clarified the plaintiff's prima facie burden in disciplinary discharge cases, and we held that a plaintiff does not have to show differential treatment of persons outside the protected class to meet the initial prima facie burden under McDonnell Douglas. See Kendrick, 220 F.3d at 1228-29.

> This is because comparison to a person outside of the protected class . . . is unnecessary to create an inference of discriminatory discharge. . . . The firing of a qualified minority employee raises the inference of discrimination because it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement.

Id. at 1229 (citation and quotations omitted)  Thus, to meet his prima facie burden a plaintiff in a discriminatory discharge case need only show that: "(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge." Kendrick, 220 F.3d at 1229.

In this case we have no trouble concluding that English has met his prima facie burden.  It is undisputed that English, an African-American man, is a member of a protected class.  Although the district court noted some dispute over the quality of his work, it correctly found that the extensive period of time that English held his position at least entitles him to an inference of satisfactory performance sufficient to survive summary judgment.  Cf. MacDonald v. Eastern Wyo. Mental Health Ctr., 941 F.2d 1115, 1121 (10th Cir. 1991) ("[A] plaintiff may make out a prima facie case of discrimination in a discharge case . . . by evidence that she had held her position for a significant period of time." (citations omitted)).  Neither party has raised evidence tending to show whether English's position was eliminated after his discharge.  However, given the DOC's stated reason for firing English -- that he had violated DOC rules by engaging in a sexual relationship with an inmate -- we have no trouble concluding that there is sufficient evidence in the record to find English was not terminated because of a workplace reduction.

Having established his prima facie case, English successfully shifted the burden of production to the DOC to articulate a legitimate, nondiscriminatory reason for its action.  See Burdine, 450 U.S. at 254-55.  "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection."  Id.  The district court held that the

DOC's evidence that English was fired for having a sexual relationship with Bowen was sufficient to satisfy that burden, and English does not challenge this finding on appeal. We therefore move directly to a consideration of whether he has offered sufficient evidence for a jury to find that the DOC's evidence of sexual misconduct with an inmate is merely a pretext concealing intentional racial discrimination.

The evidence that a plaintiff can put forward to overcome a defendant's legitimate, nondiscriminatory reason for an adverse employment action can take a variety of forms. See, e.g., Kendrick, 220 F.3d at 1230.

> A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.

Id. (citations omitted). In certain cases, a plaintiff's prima facie case and the inferences that may be drawn therefrom themselves cast sufficient doubt on a defendant's nondiscriminatory reason to satisfy his burden of showing pretext. See Reeves v. Sanderson Plumbing Prod., 120 S. Ct. 2097, 2106 (2000) (citing Burdine, 450 U.S. at 256 n.10). In this case, however, nothing in the bare facts of

English's discharge itself casts doubt on the DOC's proffered evidence that he violated Colorado's criminal law and the DOC's workplace regulations.

Rather, English argues that he has submitted sufficient evidence for a reasonable jury to conclude the DOC's proffered reason is pretextual.[4] He first notes that he steadfastly maintained his innocence of any violation of law or DOC regulation, and that the DOC did not offer to reinstate him after the criminal charges were eventually dropped. Further, he points out that McGoff refused his request for an unpaid leave of absence to marshal evidence of his innocence, and that he was not given the opportunity to seek reinstatement after the criminal charges were dropped. Finally, he asserts that McGoff had a history of treating minority employees with condescension, and that McGoff's reliance on the incomplete evidence presented to him by the investigators gives rise to an inference that his intentions were tainted by racial bias.

As an initial point, the fact that criminal charges against English were dropped has little bearing on whether the DOC's decision was pretextual. The DOC has not alleged that it terminated him because he faced criminal sexual assault charges. Rather, the DOC reached an independent conclusion that there

---

[4]Because the district court reviewed English's prima facie case for evidence of discrimination that would typically be considered in the pretext phase, such as evidence of dissimilar treatment for similarly situated protected and non-protected employees, we have taken record citations from throughout English's brief to determine whether he has submitted sufficient evidence to show pretext.

was sufficient evidence to warrant his termination based on the witness statements, the DPD's polygraph examination, and the results of the serology and DNA tests. The Denver District Attorney's subsequent decision not to prosecute English is simply irrelevant to the question of whether his termination was actually driven by the evidence of misconduct that the DOC had before it. There is no reason to believe the DOC should have reinstated English after the charges were dropped, since the District Attorney's action did not in any way take away from the evidence supporting the DOC's initial decision to dismiss him.

Further, English argues that there is sufficient evidence that McGoff allowed a culture of racial hostility to flourish within the DRDC for a jury to infer that his decision to terminate English was motivated by racial animus. In support of this argument, English offers affidavits by African-American and Hispanic DRDC employees that McGoff was more critical of minority employees than of white employees, and that he failed adequately to investigate reports of racial epithets directed at the affiants. However, in order to meet his pretextual burden, English must show some nexus between this circumstantial evidence and McGoff's decision to terminate him. See Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1209-10 (10th Cir. 1999). Isolated, racist remarks by co-workers are insufficient to carry this burden. See Cone v. Longmont United Hosp. Ass'n., 14 F.3d 526, 531 (10th Cir. 1994). Likewise, evidence that McGoff himself was

condescending to minority staff members and more critical of them than of white employees falls short of English's burden. See Shorter, 188 F.3d at 1209-1210. It is true that these affidavits provide circumstantial evidence that McGoff harbored discriminatory feelings toward people of color. However, "[w]here . . . plaintiff seeks to demonstrate that the employer's explanation is merely a pretext, this court 'requires a showing that the tendered reason for the employment decision was not the genuine motivating reason, but rather was a disingenuous or sham reason.'" McKnight, 149 F.3d at 1129 (quoting Reynolds, 69 F.3d at 1535). Nothing in these allegations of McGoff's racial prejudice rebuts the DOC's evidence that English was terminated for having a sexual relationship with an inmate. Therefore, they are insufficient to carry English's burden of showing pretext. Cf. Shorter, 188 F.3d at 1209-1210 (evidence of defendant's racist attitudes was insufficient to show pretext in light of strong evidence demonstrating that the plaintiff's poor job performance and work attitude were the true reasons for her termination).

English's evidence of retaliation similarly fails to raise a material question of fact on the issue of pretext. This evidence consists of an affidavit by Frank Irions, a senior DRDC staff member and one of English's co-plaintiffs in the first Title VII suit against the DOC, alleging that administrators in the DOC central office manipulated position vacancies to ensure Irions would not be promoted to a

- 16 -

position of warden or associate warden.  However, Irions's affidavit is conclusory as to claims of retaliation, and it does not support a conclusion that evidence of sexual misconduct was not the true reason for English's termination.

English argues that, even in the absence of evidence that McGoff's prejudice led to his termination, the district court should have denied summary judgment.  He suggests that the record is sufficient to show that the DOC's investigation into Bowen's allegations was itself biased, and that the investigators manipulated their findings to ensure that English would be terminated.  Under this theory, it is irrelevant that English failed to prove McGoff acted with racial animus because he was a mere rubber-stamp or "cat's paw" for the allegedly biased investigators who worked on English's case.  English is correct that, under certain circumstances, a defendant may be held liable for a subordinate employee's prejudice even if the manager lacked discriminatory intent.  See, e.g., Kendrick, 220 F.3d at 1231-32; Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999); Willis v. Marion County Auditor's Office, 118 F.3d 542, 548 (7th Cir. 1997).  To recover under this theory, the plaintiff must show "that the decisionmaker followed the biased recommendation [of a subordinate] without independently investigating the complaint against the employee." Stimpson, 186 at 1332.

For the purpose of argument, we will assume the investigators following up on Bowen's allegations were prejudiced. However, English has not demonstrated that McGoff accepted their findings as a rubber stamp without independent investigation. To the contrary, McGoff held two meetings with English and his attorney in which English was asked to provide evidence rebutting or mitigating the investigators' findings. Because of the pending criminal charges, English waived his opportunity to respond to McGoff's requests, choosing instead to seek an unpaid leave of absence and to challenge the relevance of certain pieces of documentary evidence. A plaintiff cannot claim that a firing authority relied uncritically upon a subordinate's prejudiced recommendation where the plaintiff had an opportunity to respond to and rebut the evidence supporting the recommendation. Cf. Kendrick, 220 F.3d at 1231-32 (cat's paw doctrine did not apply where supervisor offered plaintiff an opportunity to tell his side of the story, but the plaintiff refused); Stimpson, 186 F.3d at 1332 (refusing to apply cat's paw doctrine where plaintiff appeared before a civil service board to present witnesses and offer other evidence refuting allegations of misconduct); Willis, 118 F.3d at 547-48 (refusing to apply doctrine where decision maker offered plaintiff an opportunity to prove her assertion that she was the victim of a racially-motivated campaign to concoct evidence of incompetence but plaintiff failed to do so). Rather, McGoff's attempt to balance the investigators' findings

with English's own version of events cuts off any alleged bias on the part of the investigators from the chain of events leading to English's termination. Therefore, the cat's paw doctrine does not apply in this case.

Finally, English has presented evidence that he was treated differently from a similarly situated white female employee of the DRDC who had a sexual relationship with an inmate but who was not disciplined. English is correct that dissimilar treatment between similarly situated protected and non-protected employees may give rise to an inference of discrimination. See Hardy v. S.F. Phosphates Ltd. Co., 185 F.3d 1076, 1082 (10th Cir. 1999). When comparing the relative treatment of similarly situated minority and non-minority employees, the comparison need not be based on identical violations of identical work rules; however, the violations must be of comparable seriousness. See Elmore v. Capstan, Inc., 58 F.3d 525, 530 (10th Cir. 1995).

However, English's evidence is insufficient to establish pretext. In the first place, the white female employee who was not discharged was accused of kissing an inmate, and that does not seem of comparable seriousness to multiple acts of sexual intercourse between a prison employee and an inmate. More importantly, here the DOC presented evidence that at least two additional white female employees were investigated for having physical relationships with inmates; the first was terminated, and the second resigned her position before disciplinary

proceedings began. A plaintiff "can not pick and choose a person [he] perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less favorably than [he]." Simpson v. Kay Jewelers, 142 F.3d 639, 646-47 (3rd Cir. 1998). Rather, if the record establishes that a number of non-protected employees have found themselves in similar circumstances, the plaintiff must show that the employer had established a pattern of granting more favorable treatment to protected employees for the relevant infraction.

Therefore, we hold that English has failed to raise sufficient evidence of pretext to survive summary judgment under the McDonnell Douglas framework, and we therefore affirm the district court's grant of summary judgment.

B.     Fees and Costs

The district court initially granted the DOC's motion for attorney's fees pursuant to 42 U.S.C. § 1988.[5] However, the court later reversed itself in light of Christiansburg Garment Co. v. E.E.O.C., 434 U.S. 412, 422 (1978) (holding that an unsuccessful civil rights plaintiff in a Title VII action can be liable for attorney's fees only if the court finds "his claim was frivolous, unreasonable, or

---

[5]42 U.S.C. § 1988(b) states, in relevant part, "In any action or proceeding to enforce a provision or sections 1981 [or] 1983 . . . of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

groundless, or that the plaintiff continued to litigate after it clearly became so").

The DOC does not challenge on appeal the district court's reconsidered decision to disallow attorney's fees in this case. However, English now challenges the district court's award of $2,119.80 in costs to the DOC pursuant to 28 U.S.C. § 1920.[6] We review the district court's award of court costs under § 1920 for abuse of discretion. See Mitchell v. City of Moore, 218 F.3d 1190, 1198 (10th Cir. 2000).

The district court rightly concluded that a civil rights litigant should look to the general federal statutory entitlement for court costs under § 1920. See Case v. Unified Sch. Dist. No. 233, 157 F.3d 1243, 1258 ("For items not reimbursable as attorney's fees under § 1988, the general costs statute, 28 U.S.C. § 1920, is

_____

[6]28 U.S.C. § 1920 reads,

A judge or clerk of any court of the United States may tax as costs the following:
(1) Fees of the clerk or marshal;
(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
(5) Docket fees under section 1923 of this title;
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses and costs of special interpretation services under section 1828 of this title.
A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

- 21 -

controlling." (quotations and citations omitted)).  Further, despite the protections established for civil rights plaintiffs under Christiansburg Garment, a civil rights plaintiff is not entitled to heightened protection from taxation of costs pursuant to § 1920.  See Mitchell, 218 F.3d at 1204 (upholding the "traditional presumption in favor of awarding costs, regardless of whether the prevailing party is a defendant in a civil rights case.").

"[T]he burden is on the prevailing plaintiffs to establish the amount of compensable costs and expenses to which they are entitled.  Prevailing parties necessarily assume the risks inherent in a failure to meet that burden." Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1208 (10th Cir. 1986); see also Case, 157 F.3d at 1258.  The DOC supported its motion with a spreadsheet page showing disbursements to couriers, a court reporter and other service providers.  The spreadsheet contains a list of names of these service providers, the amounts paid, and a blanket assertion that the costs incurred are among those allowed under § 1920.  This information is simply insufficient to carry the DOC's burden of establishing its right to costs.  Cf. Case, 157 F.3d at 1258-59 (denying requested fees for copying because prevailing party failed to submit any evidence justifying the amount requested).  The DOC makes no attempt to explain how the listed expenditures meet the requirements of § 1920 or even to identify the purpose of each expenditure.  In the absence of any such identification, we hold the DOC is

not entitled to costs under § 1920 on the basis of the record before us. Thus, we reverse the award of costs to the DOC.

## IV. CONCLUSION

We AFFIRM the district court's grant of summary judgment in favor of the DOC. However, we hold that the district court erred in granting the DOC's motion for costs under 28 U.S.C. § 1920, and we therefore REVERSE its postjudgment order of costs in favor of the DOC.

99-1452, English v. Colorado

**LUCERO**, Circuit Judge, concurring.

I join in the majority opinion, but write separately to observe the clear distinction between the situation presented here and that before us in Shorter v. ICG Holdings, Inc., 188 F.3d 1204 (10th Cir. 1999). In the instant case, although there is evidence that McGoff, the terminating supervisor, was motivated by racial animus, there is no evidence that connects the alleged racial animus on the part of McGoff directly to plaintiff. This makes this case readily distinguishable from Shorter where there was substantial evidence connecting the alleged racial animus on the part of the terminating supervisor directly to plaintiff. See, e.g., Shorter, 188 F.3d at 1214 (Lucero, J., dissenting) (summarizing evidence). As such, I agree with the conclusion that English failed to show a nexus between the circumstantial evidence of racism and his termination, thus failed to demonstrate pretext, and accordingly could not overcome defendant's motion for summary judgment.