Ramon ZAMORA, Plaintiff,

v.

ELITE LOGISTICS, INC., Defendant.

No. 03–2230–JWL.

United States District Court,
D. Kansas.

May 4, 2004.

Aldo P. Caller, Kansas City, KS, for Plaintiff.

Carl A. Gallagher, Ryan B. Denk, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for Defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Ramon Zamora filed suit against his former employer, defendant Elite Logistics, Inc., alleging defendant unlawfully terminated him on the basis of his race, nationality, or national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*[1] This matter is presently before the court on defendant's motion for

---

1. Plaintiff also originally alleged that defendant violated 42 U.S.C. § 1983, but the court granted defendant's motion to dismiss that claim. *See Zamora v. Elite Logistics, Inc.*, No. 03–2230, 2003 WL 22757933, at *1 (D.Kan. Nov.18, 2003).

summary judgment (doc. 33). For the reasons explained below, defendant's motion is granted and this case is dismissed.

## STATEMENT OF MATERIAL FACTS [2]

Plaintiff is originally from Mexico. He was issued his social security card in the United States in approximately 1980 or 1981 and became a lawful permanent resident in 1987. Defendant hired him in August of 2001. At that time, he disclosed the fact that he was a Mexican national. He presented his alien registration card, his social security card, and signed an I–9 form.

In December of 2001, defendant received a tip about a possible inspection by the Immigration and Naturalization Service ("INS") at its location on Kansas Avenue in Kansas City, Kansas. Although defendant's policy had been to make copies of documents requested in connection with I–9 forms, defendant's human resources manager, Larry Tucker, was informed that there was a period of time when defendant had not necessarily obtained, copied, or even asked for the appropriate documentation required by the I–9 form, and therefore there was a good possibility that illegal aliens were working for defendant. Apparently the origin of this problem was a strike in approximately June of 2000. Because of the strike, defendant needed to hire approximately three hundred employees during a period of a few weeks. At the time, defendant's hiring practices had been that if they could "get a body in the

door," they would hire the individual. The appropriate background checks and visual inspections of right-to-work and identity documents had not been conducted on all of these employees.

After Mr. Tucker received the tip regarding the anticipated INS inspection, defendant had the social security numbers ("SSNs") of all of its approximately 650 employees at the Kansas Avenue location checked by two different independent contractors, Datasource and Verifications, Inc. On January 9, 2002, Datasource notified defendant that someone else had used plaintiff's SSN in Stockton, California, and Manteca, California, in 1989, 1995, and 1997. Defendant then requested that Verifications also check plaintiff's SSN. In March of 2002, Verifications notified defendant that someone else had used plaintiff's SSN for credit purposes. The report stated that verification through the Social Security Administration "can only be done by the company that has hired the applicant by calling 800–772–1213." Mr. Tucker did not ask plaintiff whether he had ever worked in Stockton or Manteca, and he did not call the 800 number to verify the information from Verifications. Instead, he decided to "put the burden of proof on the employee" because approximately 35–40 of the 650 SSNs had come back to defendant with problems.

On May 10, 2002, Mr. Tucker called plaintiff into his office. He asked plaintiff to provide documentation within ten days

**2.** Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are uncontroverted or, if disputed, are viewed in a light most favorable to plaintiffs, the non-moving parties. *See, e.g., Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (setting forth summary judgment standards).

The court has disregarded the last sentence of paragraph 23, the last two sentences of paragraph 27, and all of paragraph 51 of plaintiff's statement of uncontroverted facts.

The court has disregarded these statements largely because they were not material to the court's resolution of the issues presented. In addition, plaintiff supported them with citations to pages 87, 88, 100, and 101 of Mr. Tucker's deposition and pages 46, 47, and 49 of plaintiff's deposition, none of which were filed with the court. In the future, counsel for plaintiff may want to make sure that the pages relied upon in the statement of facts are a part of the record.

establishing that he had a right to work in the United States. Mr. Tucker presented plaintiff with two memoranda that were virtually identical except that one was in English and the other was in Spanish. The English version stated:

It is required by federal law that all employees produce documents, which establish their identity and/or employment eligibility to legally work in the United States when they are hired. This eligibility can be established with a U.S. Passport, a Certificate of Citizenship or Naturalization; or with a combination of other documents, such as a state driver's license, state or federal ID card, U.S. Social Security card and/or a certified copy of a birth certificate, issued by a state of the United States.

It has come to our attention that the documents you provided us previously are questionable. Therefore, we are asking that you obtain proper documentation, or you may not be permitted to continue working here. Please bring proper evidence of your identity and employment eligibility no later than five o'clock p.m. on Monday, May 20, 2002, to the Department of Human Resources, or you may be terminated. Thank you.

On the bottom of the form was a portion regarding "Eligibility Documentation," which stated:

I understand and agree that until and if I provide documents, which establish my identity and/or employment eligibility to legally work in the United States, Elite Logistics may not be able to continue permitting me to work. I also understand and agree that I have until five o'clock p.m. on Monday, May 20, 2002, to produce this documentation.

Plaintiff signed and dated this return memorandum May 10, 2002.

On May 22, 2002, Mr. Tucker once again had plaintiff brought to his office along with Ray Puentes, who was plaintiff's union steward and who acted as a translator. Mr. Tucker told plaintiff that he had asked for documentation on May 10, but that plaintiff had failed to provide it. Mr. Tucker told plaintiff that defendant would put him back to work if and when he brought back the appropriate documentation. Until then, however, Mr. Tucker told Mr. Puentes to tell plaintiff: "You have to bring these additional documents or you can't work here." Thus, plaintiff was taken off work indefinitely until he could bring in the appropriate documents to demonstrate he was entitled to work. At one point during this conversation, Mr. Puentes, presumably speaking for plaintiff, accused Mr. Tucker of picking on Hispanic employees.

On or about May 22, 2002, plaintiff brought Mr. Tucker a document from the INS showing he had applied for naturalization in 2001. Along with this document were earnings records from the Social Security Administration showing the use of plaintiff's SSN by someone named "R. Zamora" and whose date of birth was "2/1960." The document that plaintiff had provided to defendant when he was hired, however, showed his date of birth to be June 14, 1961. Mr. Tucker became even further concerned about plaintiff's SSN when he noticed the different birth dates. Mr. Tucker expressed these concerns to plaintiff and informed plaintiff that he would need to bring in further documentation to establish his right to work. The INS form provided a customer service number, but Mr. Tucker did not call that number.

Plaintiff testified in his deposition that on or about May 22, 2002, he presented Mr. Tucker with his naturalization certificate and told Mr. Tucker he was now a United States citizen. Mr. Tucker, however, did not accept this paperwork as adequate. He told plaintiff he did not care

about this but instead wanted social security papers or another SSN. Mr. Tucker told plaintiff not to come to work until he got a different SSN. Plaintiff testified in his deposition that he also presented Mr. Tucker with his social security card, that Mr. Tucker told him his SSN was stolen from someone else, and that Mr. Tucker treated him rudely in rejecting his documentation.[3]

On May 23, 2002, plaintiff brought Mr. Tucker a document dated May 23, 2002, bearing the office stamp of the Social Security Administration. The document stated plaintiff's SSN was assigned to an individual named "Ramon Zamora Farias." This name corresponded with the name on the documents that plaintiff had originally provided to defendant when he was hired. Mr. Tucker told plaintiff that defendant would have to verify this documentation, and that if the information checked out he could come back to work. Mr. Tucker directed his secretary to confirm with the Social Security Administration that plaintiff was the individual who was actually assigned the SSN and, if so, to call plaintiff and direct him to report to work. His secretary confirmed the SSN was indeed

assigned to plaintiff and, on May 25, 2002, she called him and asked him to return to work.

■■■■ On or about May 29, 2002, plaintiff presented Mr. Tucker with a letter that stated:

I was told on Saturday, May 25 that I could come back to work on Wednesday, May 29. Before I could consider going back to work I need from you two things: 1) an apology in writing, and 2) a complete explanation of why I was terminated.

Please send a response to my home . . . . Thank you.

Plaintiff testified in his deposition that he would not have returned to work unless he received a written apology and an explanation of why he was taken off work.[4]

According to Mr. Tucker's deposition testimony, he considered plaintiff a "voluntary quit" at that point because he was not going to apologize to plaintiff. He explained that was

[b]ecause he had a job waiting for him; I was willing to accept him back into his spot on the seniority roster in the job he

---

**3.** The record is unclear regarding precisely when, chronologically, these things occurred.

**4.** Plaintiff submitted an affidavit in support of his opposition to defendant's motion for summary judgment stating that although he requested an apology and an explanation before returning to work, he would have returned to work even if those requests had been denied. "[I]n determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements." *Lantec, Inc. v. Novell, Inc.,* 306 F.3d 1003, 1016 (10th Cir.2002) (citing *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986)). "In assessing a conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Id.* The relevant factors in making this determination are "whether the affiant was cross-examined during his earlier

testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* In this case, all of these factors weigh in favor of the court disregarding plaintiff's affidavit. Plaintiff was cross-examined during his deposition. *See* Pl.'s Dep. at 42. Further, his affidavit is not based on any newly discovered evidence. He knew at the time of his deposition the circumstances under which he would have returned to work for defendant. *Id.* at 18. The affidavit is not an attempt to clarify any confusion that he expressed during his deposition. His deposition testimony was unequivocal, and the statement in his affidavit directly contradicts that testimony. Thus, the court will disregard this statement in his affidavit as an attempt to create a sham fact issue.

had been doing with no disciplinary action, no adverse action of any kind. And he said—in this written statement he said, "I will only come back to work if I receive a written apology." And my position and my thought process would have been, "You can go downstairs and you can start working or you can choose not to, but you're not getting a written apology."

Plaintiff testified in his deposition that Mr. Tucker grabbed the letter and told plaintiff he was fired because he was not going to apologize. Mr. Tucker told plaintiff that he did not have to give plaintiff an explanation and that he would fire plaintiff rather than apologize. In an e-mail to human resources personnel that same day, Mr. Tucker wrote that he told plaintiff his demands "were not acceptable and would not even be considered. I gave him his check from last week and ordered him out of the building." Mr. Tucker stated in his deposition that he may have told plaintiff to "just get the hell out."

As mentioned previously, defendant had approximately 650 of its employees' SSNs checked and, of those, approximately thirty-five came back with questions. All of those approximately thirty-five were notified of the problem. To each of those approximately thirty-five employees, defendant handed out memoranda identical to the May 10 memoranda that Mr. Tucker gave to plaintiff. All of these individuals except four acknowledged they were illegal workers and quit. Of the remaining four, plaintiff was the only individual who ultimately presented the proper paperwork and was allowed to continue his employment. Plaintiff, however, testified that he knew of other individuals who lost their jobs with defendant and then were hired back later with different SSNs or different names.

Based on these facts, plaintiff asserts a claim against defendant pursuant to Title VII, alleging defendant unlawfully terminated him because of his race, nationality, or national origin. He contends he was terminated or at least suffered adverse employment action on May 22 when he was called into Mr. Tucker's office and taken off work indefinitely. He also contends he was discriminatorily discharged on May 29 when Mr. Tucker fired him. Defendant contends it is entitled to summary judgment because: (1) plaintiff cannot demonstrate a prima facie case because he was not terminated and instead voluntarily resigned; (2) defendant had legitimate nondiscriminatory reasons for its conduct; and (3) plaintiff has failed to adduce evidence that defendant's proffered reasons for its conduct were pretextual.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a gen-

uine issue of material fact and entitlement to judgment as a matter of law. *Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler,* 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *see also Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore,* 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every ac-

tion.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## ANALYSIS

■■■ The court analyzes plaintiff's claim under the familiar burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. Under this framework the plaintiff must initially establish a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. 1817; *English v. Colo. Dep't of Corr.,* 248 F.3d 1002, 1008 (10th Cir.2001). If the plaintiff establishes this prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *accord English,* 248 F.3d at 1008 (quoting *McDonnell Douglas*). If the employer meets this burden, then the burden reverts to plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817 (plaintiff must show defendant's stated reason was a pretext); *English,* 248 F.3d at 1008 (same)

For the reasons explained below, the court finds that plaintiff has established a prima facie case of discrimination with respect to both incidents, *i.e.,* being taken off work indefinitely on May 22 and allegedly being terminated on May 29. Defendant, in turn, has offered legitimate, nondiscriminatory reasons for its conduct on both of those dates. On May 22, Mr. Tucker feared the ramifications of an anticipated INS inspection if he did not ensure that plaintiff was a properly documented worker. On May 29, he construed

plaintiff's demand for a written apology and explanation as an ultimatum, he rejected that ultimatum, and hence plaintiff left his employment with defendant regardless of the label on his departure. There is no evidence in the record from which it can be reasonably inferred that either of these justifications were a pretext for discrimination on the basis of plaintiff's race, nationality, or national origin. Accordingly, defendant is entitled to summary judgment.

## I. Plaintiff's Being Taken Off Work Indefinitely as of May 22

### A. Prima Facie Case

■ Under the *McDonnell Douglas* framework, "[a] plaintiff in a discriminatory suspension case—as distinguished from a discriminatory discharge case—makes out a prima facie case upon showing: (1) that plaintiff belongs to a protected class; (2) that he suffered an adverse employment action; and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir.2002) (listing these elements in a § 1981 claim); *see also Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir.1991) ("[T]he elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in *McDonnell Douglas*,

whether that case is brought under §§ 1981 or 1983 or Title VII."). Here, defendant does not urge the court to grant summary judgment based on plaintiff's failure to establish the first and third of these prongs. Rather, defendant contends plaintiff cannot establish the second of these prongs—that plaintiff suffered adverse employment action.[5]

■ "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Although the Tenth Circuit liberally defines adverse employment action, the Circuit nonetheless takes a case-by-case approach to determining whether a given action is adverse and examines the unique factors relevant to the situation at hand. *Jeffries v. Kan.*, 147 F.3d 1220, 1231–32 (10th Cir.1998). "To be an adverse action, the employer's conduct must be materially adverse to the employee's job status." *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1213 (10th Cir. 2003) (internal quotation omitted).

■ Plaintiff was taken off work indefinitely without pay on May 22, which was essentially akin to a suspension. "Actions such as suspensions ... are by their very

---

**5.** Defendant also contends plaintiff has never alleged a claim for general adverse employment action short of outright discharge, and therefore any claim for adverse employment action other than discriminatory discharge is not before the court. The pretrial order supersedes the complaint. *Adams v. Reliance Standard Life Ins. Co.*, 225 F.3d 1179, 1183 (10th Cir.2000). Defendant is correct that plaintiff's contentions in the pretrial order center around discharges rather than other forms of adverse employment action. Specifically, plaintiff contends in the pretrial order that Mr. Tucker fired him on May 22 and

again on May 29. Pretrial Order (Doc. 32), at 7. Ultimately, the record does not support the contention that plaintiff was discharged on May 22. Nevertheless, there is a fine line between whether he was discharged or taken off work indefinitely on May 22, particularly in light of the fact that he never actually returned to work. Thus, the court will not deem waived plaintiff's argument that he suffered adverse employment action on May 22 because that adverse employment action falls one small step short of being characterized as a discharge.

nature adverse, even if subsequently withdrawn." *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir.1998). Thus, plaintiff suffered adverse employment action when he was taken off work indefinitely without pay on May 22. *See, e.g., Russell v. Bd. of Trustees of Univ. of Ill.*, 243 F.3d 336, 341–42 (7th Cir.2001) (five-day suspension with loss of pay was an adverse employment action); *Kennedy v. Gen. Motors Corp.*, 226 F.Supp.2d 1257, 1265 (D.Kan.2002) (disciplinary suspensions constituted adverse employment actions where employee alleged she had not been paid for lost time); *Zander v. Shawnee County*, No. 00–2269, 2002 WL 1067839, at *4 n. 3 (D.Kan. May 13, 2002) (ten-day suspension constituted adverse employment action); *Austin v. Haaker*, 76 F.Supp.2d 1213, 1217–18 (D.Kan.1999) (suspension constitutes an adverse employment action). Accordingly, plaintiff has established a prima facie case of discrimination with respect to his being taken off work indefinitely as of May 22.

### B. Legitimate, Nondiscriminatory Reason

██ Because plaintiff has established a prima facie case, the burden of production shifts to defendant to demonstrate a legitimate, nondiscriminatory reason for its actions. Defendant contends its actions were justified by its good faith attempts to abide by federal laws that make it unlawful to employ illegal immigrants. The Immigration Reform and Control Act of 1986 ("IRCA") is a comprehensive scheme prohibiting the employment of illegal aliens in the United States. *Hoffman Plastic Compounds v. NLRB*, 535 U.S. 137, 147, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002). It establishes an extensive employment verification system that makes combating employment of illegal aliens central to the policy of immigration law. *Id.* Under the IRCA, it is unlawful for employers to knowingly hire or continue to employ undocumented workers, 8 U.S.C. § 1324a(a)(1), (2), and makes it a crime for an unauthorized alien to subvert the employer verification system by knowingly tendering fraudulent documents, *id.* § 1324c(a). "Employers who violate the IRCA are punished by civil fines and may be subject to criminal prosecution." *Hoffman Plastic*, 535 U.S. at 148, 122 S.Ct. 1275 (citations omitted; citing § 1324a(e)(4)(A), (f)(1)). Thus, the court is satisfied that defendant had a legitimate, nondiscriminatory reason for requiring plaintiff to produce documents that adequately evidenced his right to work in this country, for giving him ten-days' notice that he needed to do so, and for taking him off work indefinitely on May 22 when he failed to do so.

### C. Pretext

██ The burden then shifts to plaintiff to resist summary judgment by presenting evidence that defendant's reasons are pretextual (*i.e.*, unworthy of belief) or by otherwise introducing evidence of a discriminatory motive. *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir.2002). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quotation omitted). In making this determination, the court considers the evidence as a whole. *Id.*

Ordinarily this test can be "satisfied by proof that the employer treated similarly situated employees more favorably." *Hysten*, 296 F.3d at 1181. Here, however, there is no evidence that defendant treated similarly situated employees more favorably than plaintiff. To the contrary, plain-

tiff was treated largely the same as the other employees at defendant's Kansas Avenue location. Defendant had all 650 employees' SSNs checked and gave identical memoranda to all of the approximately thirty-five whose SSNs came back with problems. Of the four who did not admit they were illegal aliens and quit when they were confronted, plaintiff was the only one who ultimately produced the correct documentation. Thus, plaintiff has not demonstrated pretext on the basis of defendant's unequal treatment of him. Nevertheless, the court "must be sensitive to the myriad of ways such an inference can be created," *id.* (quotation omitted), hence the court must examine whether there is any other evidence in the record from which it can be reasonably inferred that defendant's reason is a pretext for discrimination.

Taking the facts in the light most favorable to plaintiff, one might conclude that Mr. Tucker may have been overly stringent in rejecting certain documents as adequate, instead demanding documentation specifically from the Social Security Administration. But that is insufficient to give rise to an inference of pretext. It is highly significant that immediately after plaintiff presented Mr. Tucker with the document from the Social Security Administration on May 23, Mr. Tucker directed his secretary to ask plaintiff to return to work if she was able to verify plaintiff's SSN with the Social Security Administration. His secretary did so and called plaintiff only two days later to direct him to return to work. Thus, there is no basis for a reasonable factfinder to rationally find defendant's reasons unworthy of credence. The evidence reflects that the sole impetus behind Mr. Tucker's actions, cau-

tious as they were, was a concern about the validity of plaintiff's right-to-work documents. This justification for his actions is not implausible nor weak in light of the fact that defendant could have been subjected to civil and criminal penalties if plaintiff had in fact turned out to be an undocumented alien.

Plaintiff makes much of the fact that Mr. Tucker did not affirmatively initiate an independent investigation of the matter himself by, for example, reviewing copies of documents attached to plaintiff's original I–9 form in his personnel file, taking time to review the other documents plaintiff presented to Mr. Tucker, and calling the telephone numbers listed on the various forms. Mr. Tucker, however, testified that he decided to "put the burden of proof on the employee" with respect to *all* of the SSNs that came back with problems, and therefore there is no suggestion that he was discriminating against plaintiff on the basis of his race, color, or national origin by electing not to follow up on these alternative routes to verify plaintiff's right-to-work status.[6]

Plaintiff also argues that it was unlawful for Mr. Tucker to reject the various documents that he presented and to hound him specifically for adequate social security documentation when plaintiff had already presented other documents that were adequate to establish his right to work in this country. It is true that the IRCA states that an employer should not request "more or different documents ... or [refuse] to honor documents tendered that on their face reasonably appear to be genuine," but the IRCA provides that doing so is an "unfair immigration-related employment

**6.** Plaintiff's argument faulting Mr. Tucker for not taking a stronger initiative is especially curious given plaintiff's similar failure to take the initiative to provide Mr. Tucker with *any* documents between May 10 and May 22 de-

spite the fact that Mr. Tucker had requested additional documentation and provided plaintiff with fair warning that he could be terminated if he did not produce the additional documents by May 20.

practice" only if an employer does so "for purposes of satisfying the requirements of section 1324a(b) of this title." 8 U.S.C. § 1342b(a)(6). Section 1324a(b), in turn, pertains to "hiring, recruiting, or referring an individual for employment in the United States." Thus, an employer must accept specific documents only for initial employment purposes, not for purposes of continuing employment. The law regarding continuing employment is set forth in a separate provision, § 1324a(a)(2), and it does not contain the same documentation requirements as those pertaining to initial employment. It simply states that it is unlawful for an employer "to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment." Because this provision places an affirmative duty on employers to determine that their employees are authorized, it has been held that an employer is imputed with constructive knowledge that a worker is unauthorized if the employer deliberately fails to investigate suspicious circumstances. *See New El Rey Sausage Co. v. United States INS*, 925 F.2d 1153, 1157–58 (9th Cir.1991); *see also Hoffman Plastic*, 535 U.S. at 148, 122 S.Ct. 1275 (observing that an employer is compelled to discharge an unauthorized worker upon discovery of the worker's undocumented status). Thus, defendant could not turn a blind eye to the results of the investigations by DataSource and Verifications, which revealed potential problems with plaintiff's SSN. The court rejects plaintiff's argument that Mr. Tucker acted illegally by specifically demanding social security documentation because nothing in the IRCA required him to accept the other documents plaintiff presented. Mr. Tucker had the right to alleviate his concerns about the validity of plaintiff's SSN under all of the circumstances of this case.

There is no other evidence in the record to suggest that defendant's justification for its actions—*i.e.*, compliance with the IRCA—is unworthy of belief. Accordingly, insofar as plaintiff's Title VII claim is based on him being taken off work indefinitely as of May 22, defendant is entitled to summary judgment because plaintiff has failed to raise a genuine issue of material fact that defendant's legitimate justification for its action was pretextual.

## II. Plaintiff's May 29, 2002, Demand for a Written Apology and Explanation

### A. Prima Facie Case

A plaintiff in a discriminatory discharge case must show that: (1) plaintiff belongs to a protected class; (2) plaintiff was qualified for the job; (3) despite plaintiff's qualifications, he or she was discharged; and (4) the job was not eliminated after plaintiff was discharged. *English v. Colo. Dep't of Corrections*, 248 F.3d 1002, 1008 (10th Cir.2001). Defendant contends plaintiff cannot establish the third prong of this prima facie case because plaintiff was not discharged on May 29; he voluntarily resigned. The court disagrees because it must take all reasonable inferences in plaintiff's favor in resolving defendant's motion for summary judgment. The May 29 letter demanded an apology and explanation. It did not necessarily state that plaintiff was resigning (although certainly a rational trier of fact—or a rational employer, for that matter—could construe it as a resignation). According to plaintiff's deposition testimony, Mr. Tucker grabbed the letter out of his hands and told him he was fired. Thus, a trier of fact could find that even if plaintiff expressed an intention to resign, Mr. Tucker fired plaintiff before he formally resigned. Accordingly, plaintiff has raised a genuine issue of material fact on

the issue of whether he was discharged or voluntarily resigned on May 29. *Cf. Khan v. Costco Wholesale, Inc.,* No. 99 CV 3944, 2001 WL 1602168, at *6 (E.D.N.Y.2001) (finding an issue of fact regarding whether the plaintiff had resigned or was fired where he walked out of a meeting and did not return).

### B. Legitimate, Nondiscriminatory Reasons [7]

■ Defendant contends that Mr. Tucker believed plaintiff voluntarily resigned when Mr. Tucker refused to meet his demand for a written apology and explanation. Plaintiff's May 29 letter expressly stated that he would not consider coming back to work until he received a written apology and explanation. Even if plaintiff would have returned to work without receiving an apology and explanation from Mr. Tucker, his letter objectively manifested a contrary intent that he would *not* return to work if he did not receive an apology and explanation. Thus, Mr. Tucker's belief that his rejection of plaintiff's demands resulted in a "voluntary quit" was well founded and entirely reasonable. Therefore, defendant has satisfied its "exceedingly light," *Anaeme v. Diagnostek, Inc.,* 164 F.3d 1275, 1279 (10th Cir.1999), burden to provide a nondiscriminatory reasons for its actions. *See, e.g., Gearhart v. Sears, Roebuck & Co.,* 27 F.Supp.2d 1263, 1276 (D.Kan.1998) (holding the defendant's reasonable belief that the plaintiff had resigned was sufficient to constitute a legitimate nondiscriminatory reason for terminating an at-will employment relationship), *aff'd,* 194 F.3d 1320, 1999 WL 781056 (10th Cir.1999) (unpublished table opinion).

### C. Pretext

■ The burden then shifts to plaintiff to demonstrate that defendant's justification (*i.e.,* a belief that plaintiff voluntarily resigned) was a pretext for discrimination. The pertinent inquiry here is not whether the employer's "proferred reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Bullington v. United Air Lines,* 186 F.3d 1301, 1318 (10th Cir.1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). "The test is good faith belief," *McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1129 (1998), even if that good faith belief is later found to be erroneous, *Tran v. Trs. of State Colls.,* 355 F.3d 1263, 1268–69 (10th Cir. 2004). In making this determination, the court must "examine the facts as they appear[ed] to the person making the decision." *Watts v. City of Norman,* 270 F.3d 1288, 1295 (10th Cir.2001) (internal quotation omitted), *cert. denied,* 535 U.S. 1055, 122 S.Ct. 1912, 152 L.Ed.2d 822 (2002).

■ In this case, whether the plaintiff formally resigned or whether Mr. Tucker fired him, there is no evidence from which a reasonable factfinder could find that doubt has been cast on Mr. Tucker's belief that plaintiff would no longer work for defendant if he refused to apologize to plaintiff. That message was unequivocally communicated by plaintiff's May 29 letter. Mr. Tucker was emphatic that he would not succumb to plaintiff's demand for an apology and an explanation, regardless of whether that would result in plaintiff's departure being labeled a volun-

---

7. Defendant cannot justify its actions with respect to the May 29 termination on the same basis as it justified its actions with respect to plaintiff being taken off work on May 22, *i.e.,* defendant's concern about compli-

ance with the IRCA. By May 29, defendant had already verified plaintiff's right-to-work documents, thereby alleviating Mr. Tucker's fears that plaintiff was an undocumented alien.

tary resignation or a discharge. Admittedly, Mr. Tucker could have apologized to plaintiff for the misunderstanding and inconvenience, and he could have explained his concerns regarding plaintiff's social security documentation, the anticipated INS inspection, and the potential ramifications if an INS inspection had revealed that defendant violated the IRCA. But courts do not act as "super-personnel departments" that second-guess employer's business judgments in deciding pretext. *Tyler v. Re/Max Mountain States, Inc.*, 232 F.3d 808, 813, 814 (10th Cir.2000); *see also McKnight*, 149 F.3d at 1129 ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment."). The law does not require employers to provide apologies and explanations on demand, and there is no other evidence in the record from which it can be reasonably inferred that defendant's justification for allegedly terminating plaintiff on May 29 was unworthy of belief because it was weak, implausible, inconsistent, incoherent, or inherently contradictory. Accordingly, insofar as plaintiff's Title VII claim is based on his discharge on May 29, defendant is also entitled to summary judgment because plaintiff has failed to raise a genuine issue of material fact that defendant's justification for the termination was a pretext for discrimination.

## CONCLUSION

Ultimately, the uncontroverted facts taken in the light most favorable to plaintiff give rise to the inference that Mr. Tucker treated plaintiff in the manner he did because the information he received from Datasource and Verifications raised suspicions that plaintiff might have been an undocumented alien and Mr. Tucker feared the potential ramifications of an anticipated INS inspection. This led to a dispute, an ultimatum from plaintiff, and termination of his employment. The record is completely devoid of evidence from which it can be reasonably inferred that the impetus for Mr. Tucker's actions was plaintiff's race, color, or national origin. Even if one posited that Mr. Tucker discriminated against plaintiff on the basis of his citizenship, discrimination on the basis of citizenship or alienage, on the one hand, and discrimination on the basis of race, color, or national origin, on the other hand, are not the same. While various forms of discrimination are prohibited by Title VII, discrimination on the basis of citizenship or alienage is simply not one of them. *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973) (holding an employer's policy against hiring aliens did not violate Title VII; observing that "nothing in [Title VII] makes it illegal to discriminate on the basis of citizenship or alienage"); *see also Anderson v. Conboy*, 156 F.3d 167, 180 (2d Cir.1998) ("[C]itizenship discrimination is not covered by Title VII."); *see, e.g., EEOC v. Switching Sys. Div. of Rockwell Int'l Corp.*, 783 F.Supp. 369, 373–74 (N.D.Ill. 1992) (holding an employer's policy of terminating employees who are found to have falsified information on their employment applications did not violate Title VII because the challenged practice discriminated, if at all, only on the basis of citizenship); *Longnecker v. Ore Sorters (N. Am.), Inc.*, 634 F.Supp. 1077 (N.D.Ga.1986) (granting summary judgment on Title VII claim because claim was based on citizenship discrimination).[8] As a result, defen-

---

**8.** Although discrimination on the basis of citizenship is considered to be an unlawful immigration-related employment practice, *see generally* 8 U.S.C. § 1324b(a), that type of discrimination is made unlawful under the IRCA, not Title VII, and the only claim in this case is a Title VII claim. The IRCA provides an entirely different procedure for plaintiff to pursue such citizenship-based discrimination claims.

dant's motion for summary judgment should be granted.

**IT IS THEREFORE ORDERED BY THE COURT** that Elite's motion for summary judgment (Doc. 82) is granted and this case is dismissed.