McCONNELL, Circuit Judge,
concurring and concurring in the judgment, joined by KELLY, O’BRIEN, and TYMKOVICH, Circuit Judges, joined by GORSUCH, Circuit Judge, except for the last paragraph of Section III, and joined in Section V by HOLMES, Circuit Judge.
Plaintiff Ramon Zamora presents two claims of employment discrimination, both *1168 arising out of his employer’s efforts to ensure that every member of its workforce was legally authorized to work in the United States. Mr. Zamora’s first claim relates to his three-day suspension, which occurred after Mr. Zamora failed to respond to the employer’s notice of apparent problems with his Social Security number (“SSN”). The suspension continued after he presented an additional Social Security document containing yet another discrepancy' — a birth date different from the one he had earlier reported to the employer. Mr. Zamora’s second claim relates to his dismissal, which occurred after he obtained and provided documentation from the Social Security Administration verifying his SSN, but also demanded an apology before returning to work. The majority of this Court holds that the second claim cannot survive summary judgment because Mr. Zamora failed to present any evidence suggesting the termination was motivated by his national origin. I believe the same reason compels affirmance of summary judgment on his suspension claim. I therefore concur in the result of the equally-divided Court regarding this claim and write separately to explain my reasons.
I.
Because this case arises on appeal from a grant of summary judgment, we must view the evidence in the light most favorable to the non-moving party, Mr. Zamora. That does not mean, however, that we may disregard undisputed evidence that favors the moving party. The dissenting opinion depicts a hapless employee repeatedly offering sound documentation of his work status, and just as often being senselessly (or invidiously) rebuffed. That is scarcely a fair description of what occurred.
In June 2000, Elite Logistics, Inc., (“Elite”) confronted a worker strike that necessitated the rushed hiring of about three hundred replacement employees for its Kansas Avenue grocery warehouse in Kansas City, Kansas. In the course of this scramble, Elite failed to obtain from its new hires the employment eligibility documentation required by the Immigration Reform and Control Act of 1986 (“IRCA”). See 8 U.S.C. § 1324a(b). In August 2001, after the crisis had passed and normal hiring practices resumed, Elite hired Mr. Zamora, who presented Elite with his alien registration and Social Security cards and signed an 1-9 Employment Eligibility Verification form, as required by IRCA. Zamora v. Elite Logistics, Inc., 316 F.Supp.2d 1107, 1111 (D.Kan.2004).
Four months later, in December 2001, Elite learned of a possible inspection of the Kansas Avenue facility by the Immigration and Naturalization Service (“INS”). Recognizing that its post-strike hiring frenzy might have compromised Elite’s IRCA compliance, the company’s human resource manager, Larry Tucker, decided to verify the Social Security numbers of every worker at the facility, approximately 650 in total. Mr. Tucker hired two independent agencies to perform these verifications. Between January and March 2002, Elite received reports that 35 to 40 employees had problems with their SSNs. These employees included Mr. Zamora, whose proffered SSN had previously been used by a “Manuel Dominguez” for employment purposes in California in 1989, 1995, and 1997. Appellee’s App. at 94, 96. Mr. Tucker resubmitted most or all the problematic SSNs to a second company for rechecking. Tucker Dep. at 32-33, 42-44.[1] In March 2002, this second company reported that Manuel Dominguez had used this number for credit purposes as recently as October, 2001. Zamora, 316 *1169 F.Supp.2d at 1111; Appellee’s App. at 95, 97.
To each employee with a reported SSN problem, Elite issued a memorandum explaining that federal law requires “all employees produce documents, which establish their identity and/or employment eligibility to legally work in the United States.” Appellant’s Supp.App. at 87. The memorandum further explained that “[t]his eligibility can be established with a U.S. Passport, a Certifícate of Citizenship or Naturalization; or with a combination of other documents, such as a state driver’s license, state or federal ID card, U.S. Social Security card and/or a certified copy of a birth certificate, issued by a state of the United States.” Id. The memorandum then informed each recipient that documents previously provided by the employee were “questionable” and requested that the employee provide “proper evidence of ... identity and employment eligibility.” Id. The memorandum issued to Mr. Zamora warned that such documentation must be provided by “5:00 p.m. on Monday, May 20, 2002 ... or you may be terminated.” Id. Mr. Tucker provided Mr. Zamora with this memorandum on May 10, 2002. Mr. Zamora signed the bottom portion of the memorandum, attesting that “I understand and agree that until and if I provide documents, which establish my identify and/or employment eligibility to legally work in the United States, Elite Logistics may not be able to continue permitting me to work.” Id.
Mr. Tucker testified that of the thirty-five employees who received the memorandum, most simply disappeared. Tucker Dep. at 36, 55. None but Mr. Zamora ever attempted to provide documentation. Id. at 36-37, 54-55.
At first, even Mr. Zamora did not respond to the memorandum. On May 22, 2002 — two days after the deadline specified for response — Mr. Tucker summoned Mr. Zamora, along with Mr. Zamora’s union steward (who also served as a translator), to his office. At that meeting, Mr. Tucker informed Mr. Zamora that he had failed to produce the requested documentation and suspended him from employment until such documentation was forthcoming. The union steward accused Mr. Tucker of picking on Hispanic employees, an assertion that both Mr. Tucker and the district court assumed the steward translated on Mr. Zamora’s behalf. Id. at 58; Zamora, 316 F.Supp.2d at 1112.
What happened next is the subject of some dispute among the parties, but the district court characterized it as follows:
On or about May 22, 2002, plaintiff brought Mr. Tucker a document from the INS showing he had applied for naturalization in 2001. Along with this document were earnings records from the Social Security Administration showing the use of plaintiffs SSN by someone named “R. Zamora” and whose date of birth was “2/1960.” The document that plaintiff had provided to defendant when he was hired, however, showed his date of birth to be June 14, 1961. Mr. Tucker became even further concerned about plaintiffs SSN when he noticed the different birth dates. Mr. Tucker expressed these concerns to plaintiff and informed plaintiff that he would need to bring in further documentation to establish his right to work.. The INS form provided a customer service number, but Mr. Tucker did not call that number.
Plaintiff testified in his deposition that on or about May 22, 2002, he presented Mr. Tucker with his naturalization certificate and told Mr. Tucker he was now a United States citizen. Mr. Tucker, however, did not accept this paperwork as adequate. He told plaintiff he did not care about this but instead wanted social *1170 security papers or another SSN. Mr. Tucker told plaintiff not to come to work until he got a different SSN. Plaintiff testified in his deposition that he also presented Mr. Tucker with his social security card, that Mr. Tucker told him his SSN was stolen from someone else, and that Mr. Tucker treated him rudely in rejecting his documentation.
Zamora, 316 F.Supp.2d at 1112-13.[2]
Elite contends that the record does not support Mr. Zamora’s claim that he presented Mr. Tucker with a naturalization certificate.[3] Elite points out that no such certificate appears in the record; the only document in the record regarding Mr. Zamora’s naturalization, marked Exhibit 6, is an INS notice addressed to Mr. Zamora instructing him to attend a hearing on his application for naturalization. Appellant’s Supp.App. at 88. Mr. Zamora did, however, testify in his deposition that he presented a naturalization certificate to Mr. Tucker. Zamora Dep. at 42. Because this Court must view the evidence in the light most favorable to the nonmoving party, and because a party’s deposition testimony, even if uncorroborated by relevant documents, counts as evidence, we must assume for purposes of this appeal that Mr. Zamora presented a naturalization certificate to Mr. Tucker. However, nothing in the record suggests — and, therefore, we need not assume — that the naturalization certificate ameliorated Mr. Tucker’s concerns about the problems with Mr. Zamora’s SSN. Indeed, so far as the record reveals, Social Security numbers do not appear on naturalization certificates, and when asked whether his SSN appeared on the “citizenship papers” he presented to Mr. Tucker, Mr. Zamora responded: “I don’t think so. I can’t remember. No, I don’t think so.” Id. at 11-12.
Mr. Zamora returned the day following his suspension with a document from the *1171 Social Security Administration (“SSA”), dated May 23, 2002. This document stated that Mr. Zamora’s SSN was assigned to an individual named “Ramon Zamora Farias,” which corresponded with the name Mr. Zamora provided to Elite when originally hired. Mr. Tucker instructed his secretary to verify this documentation with the SSA and to summon Mr. Zamora back to work if it checked out. The document did check out and, on May 25, Mr. Tucker’s secretary called Mr. Zamora and asked him to return to work. Zamora, 316 F.Supp.2d at 1113. The suspension thus lasted about three days.
On or about May 29, Mr. Zamora returned to Elite and handed Mr. Tucker a letter written in English and typed at the office of his attorney. Zamora Dep. at 13. It stated: “Before I could consider going back to work I need from you two things: 1) an apology in writing, and 2) a complete explanation of why I was terminated.” Appellant’s SuppApp. at 101. Mr. Tucker testified that he considered this a voluntary resignation. Tucker Dep. at 82. Mr. Zamora testified that Mr. Tucker grabbed the letter, stated that he would fire Mr. Zamora rather than give an explanation, and told Mr. Zamora he was fired. Zamora Dep. at 34-36. Mr. Tucker admitted that he might have told Mr. Zamora to “just get the hell out.” Tucker Dep. at 96.
II.
Mr. Zamora has sued under Title VII of the Civil Rights Act of 1964, which makes it unlawful “for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race, color, religion, sex, or national origin.” 42 U.S.C. § 2000e-2(a)(l). Title VII cases are funneled through the oft-repeated McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[4] Under this formula, a Title VII plaintiff first must establish a prima facie case of discrimination — -a burden so light that only the most baseless of claims fails to satisfy it.[5] The heavy lifting of proving and defending a Title VII ease occurs in the later stages of the McDonnell Douglas analysis.
After a plaintiff has established a prima facie case, the burden “shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee’s *1172 rejection.” McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. If the employer does so, the burden shifts back to the plaintiff to show that the proffered reason is pretextual. One way a plaintiff can do so is by demonstrating “ ‘such weaknesses, implausibilities, inconsistencies, incoheren-cies, or contradictions in the employer’s proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.’ ” Danville v. Reg’l Lab Corp., 292 F.3d 1246, 1250 (10th Cir.2002) (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir.1997)). When analyzing this type of evidence, it must be kept in mind that the purpose of the McDonnell Douglas framework is to ferret out discrimination where direct evidence of such is lacking. The framework allows a factfinder to draw reasonable inferences from circumstantial evidence. As the Supreme Court has explained, “[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.” Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). “Thus, a plaintiffs prima facie case, combined with sufficient evidence to find that the employer’s asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.” Id. at 148, 120 S.Ct. 2097.
But not all evidence of pretext is sufficient to propel a case past a summary judgment challenge. Some circumstantial evidence simply does not provide enough proof to allow a reasonable factfinder to draw an inference of discrimination. As the Reeves Court cautioned:
This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury’s finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant’s explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer’s decision, or if the plaintiff created only a weak issue of fact as to whether the employer’s reason was untrue and there was abundant and uncon-troverted independent evidence that no discrimination had occurred.... To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not treat discrimination differently from other ultimate questions of fact.
Id. at 148,120 S.Ct. 2097 (internal citations and quotation marks omitted). In other words, although the McDonnell Douglas framework aids in the analysis of a Title VII suit, it is not meant to alter the purpose of Title VII, nor does it insulate an insufficient case from summary judgment, nor does it change what a plaintiff is required to show in proving a violation of Title VII — namely, discrimination. As the Supreme Court stated in McDonnell Douglas itself, the purpose of Title VII is “to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens.” McDonnell Douglas Corp., 411 U.S. at 800, 93 S.Ct. 1817. Title VII is not meant to protect an employee’s job simply “ ‘because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed.’ ” Id. (quoting Griggs v. Duke Power Co., 401 *1173 U.S. 424, 430-31, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). Thus, the McDonnell Douglas framework should not be applied in a manner that renders it nothing more than an empty pleading formula, allowing every allegation of employer discrimination to get to a jury. The touchstone of the inquiry is whether a reasonable jury could find discrimination. If not, the claim cannot survive a motion for summary judgment.
III.
Elite claims that its reason for demanding additional documentation from Mr. Zamora was a good faith — even if flawed— attempt to comply with the Immigration Reform and Control Act of 1986. IRCA is relevant here in two respects. First, the statute prohibits the knowing employment of unauthorized aliens and places affirmative burdens on employers to verify the identity and employment eligibility of employees, at the hiring stage, by examining certain documents specified by statute and regulation. See 8 U.S.C. §§ 1324a(a)(l)(A)-(B), 1324a(b); 8 C.F.R. § 274a.2(b)(l)(ii) & (v). The statute provides that, at the time of initial hiring, compliance “in good faith with the[se] requirements ... with respect to the hiring ... for employment of an alien in the United States ... establishes] an affirmative defense that [the employer] has not violated” the above provisions. 8 U.S.C. § 1324a(3). IRCA also makes it unlawful for an employer “to continue to employ [an] alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment.” Id. § 1324a(a)(2). It is this latter obligation — combined with the range of civil and criminal penalties that await employers who violate IRCA, see id. § 1324a(e)-(f) — that Elite claims prompted its actions in this case.
Second, IRCA has created employer incentives to protect against the significant disruption that may occur when immigration enforcement agents inspect a workplace and find workers out of compliance. As the then-Acting Deputy Director of United States Citizenship and Immigration Services (“USCIS”) explained in recent congressional testimony:
[0]ne of the primary reasons for a human resources manager to push participation in [a voluntary program for employee verification] was to avoid that moment when the INS would come in and raid the place and take away half the workers, and make it impossible to make any kind of production. That’s the kind of event that gets the human resources manager fired, and that’s the kind of event that they would try to plan against.[6]
Immigrant Employment Verification and Small Business: Hearing Before the Sub-comm. on Workforce, Empowerment, & Gov’t Programs of the H. Comm, on Small Business, 109th Cong. (2006) [hereinafter Verification Hearing ] (statement of Robert Divine, Acting Deputy Director, US-CIS, Department of Homeland Security). As recent events around the country illus *1174 trate, this is not an obligation that employers can afford to take lightly.[7]
One of the principal methods of ensuring employee eligibility is verification of Social Security numbers. Indeed, this is the key feature of the federal government’s Basic Pilot Program — a voluntary employment eligibility verification system created by Congress in 1997.[8] Employers who participate in Basic Pilot electronically submit information from a newly hired employee’s 1-9 form — name, date of birth, SSN, citizenship status (if provided) — for comparison with information on the SSA’s primary database, irrespective of the facially compliant documents provided by the employee to satisfy 1-9 requirements. If the information submitted by the employer matches SSA data, the employer is notified of the employee’s verified, eligible status. If the employer-submitted data and SSA records are inconsistent, or if SSA cannot issue verification for some other reason, the employer-submitted information is then checked by USCIS.[9] If eligibility still cannot be established, the government issues a “tentative nonconfirmation,” and the employer must notify the employee of the finding. USCIS, U.S. Dep’t of Homeland Sec., Findings of the Basic Pilot Program Evaluation 42 (June 2002), (at http:// www.u scis.gov/files/article/4$l).bC — II.pdf [hereinafter USCIS Findings]. Employees are given eight federal workdays to contact USCIS or SSA and resolve the problem. If the employee chooses not to contest the tentative nonconfirmation, it is considered a “final nonconfirmation” and the employer may terminate the employee. If the employee does choose to contact the relevant agency and the agency resolves the issue, the employee must notify his *1175 employer and the employer must confirm the new result through the Basic Pilot computer system. If eligibility is still not established after this period and no further verification instructions are provided by the SSA, the employer is authorized to discharge the employee. See USCIS Findings, supra, at 40-44; 62 Fed.Reg. 48309, 48312-13. See also USCIS, Report to Congress, supra note 8, at 2-3. If the employer chooses not to terminate an employee after issuance of a final nonconfir-mation, it must notify USCIS. Failure to notify constitutes a violation of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and may result in legal penalties. 62 Fed.Reg. 48309, 48313.
Compliance efforts have shifted to Social Security number verification because of the easy availability of forged documents and the prevalence of identity theft, which make other forms of documentation less reliable. At a House subcommittee hearing on proposed legislation to make participation in the Basic Pilot Program mandatory, the Chair of the House Subcommittee on Workforce, Empowerment, & Government Programs explained that “the easy availability of counterfeit documents has made a mockery of [IRCA]. Fake documents are produced by the millions, and they can be bought very cheaply.” Verification Hearing, supra (statement of Rep. Marilyn Musgrave, Chairman); see also USCIS Findings, supra, at 178, at http:// www.uscis.gov/fiIes/article/6% 5B1% 5D.a% 20CJXI.pdf. (“Individuals without work authorization frequently obtain work by using counterfeit or altered documents.”). An increasingly common method of circumventing IRCA involves flat-out identity theft, i.e., the “use [of] real documents belonging to another person. For example, individuals may borrow documents belonging to relatives or friends with similar characteristics.” USCIS Findings, supra, at 179; see also Verification Hearing, supra, (statement of Jack Shandley, Senior Vice President, Swift & Co.) (“The underground market responded [to a crackdown on counterfeit documents] by replacing counterfeit documents with genuine identification documents obtained under fraudulent terms.... ”). Reliance on data — SSN, name, birthdate, asserted citizenship status — rather than documents ameliorates this problem.
In his dissenting opinion, Judge Lucero writes at length about the anti-discrimination requirements contained within IRCA, 8 U.S.C. § 1324b(a), despite the fact that Mr. Zamora has not alleged a violation of those provisions. See Dissenting Op. at 1188-90. Citing the text, legislative history, and implementing regulations of the IRCA provisions, the dissent seems to imply that our interpretation of Title VII ought to be guided by these provisions. That suggestion is unfounded because — as the dissent acknowledges — the IRCA anti-discrimination provisions were intended to “ ‘broadenf ] the Title VII protections against national origin discrimination, while not broadening other Title VII protections.’ ” Id. at 1172 (emphasis removed) (quoting H.R. Conf. Rep. No. 99-1000 (1986), reprinted in 1986 U.S.C.C.A.N. 5840, 5842). This case arises under Title VII — not IRCA’s anti-discrimination provisions — and the principles we interpret will apply across the board to all Title VII claims. It would be contrary to congressional intent for us to “broaden” Title VII by interpreting it to coincide with the IRCA anti-discrimination provisions. To confine our analysis to Title VII does not “go far in insulating employers from national origin discrimination claims,” as the dissent charges. Id. at 1167. It simply respects the different reach of the two different statutes.
IV.
Turning first to Mr. Zamora’s suspension claim, I am at a loss to see how a *1176 reasonable factfinder could construe the sequence of events detailed above as discriminatory.
Through Mr. Zamora’s suspension on or about May 22, and up to Mr. Tucker’s rejection of Mr. Zamora’s proffer of a naturalization certificate when he returned later that day or the next, Elite’s actions are free of any taint of discrimination. When the company learned of the impending INS inspection, Elite undertook an examination of the Social Security numbers of all of its employees, without regard to their race or national origin. When it learned that thirty-five employees had irregularities regarding their Social Security numbers, Elite contacted all thirty-five and asked all thirty-five for documentation that would clear up these issues. Although Mr. Zamora complains that the company put the burden on the employees to prove their identity and eligibility rather than contacting the relevant government agencies itself, this approach was lawful, and more importantly was applied to all affected employees without regard to their race or national origin. No one disputes that the company’s outside contractors uncovered evidence of irregularities in Mr. Zamora’s SSN. No one disputes that it was lawful for the company to ask Mr. Zamora to clear up the discrepancy. No one disputes that the company gave Mr. Zamora sufficient time — ten days — to do so. And no one disputes that, twelve days after receiving notice, Mr. Zamora had failed to do anything to clear up the problem. At the time when Mr. Zamora was suspended from employment on May 22, therefore, no reasonable juror could find that he had been treated differently from any other employee, on the basis of his national origin. See Zamora, 449 F.3d at 1118-19 (Ebel, J., dissenting).
The discriminatory suspension claim arises primarily from Mr. Zamora’s allegation that he later presented Mr. Tucker with a certificate of naturalization, and that Mr. Tucker refused to accept it as sufficient resolution of his Social Security number irregularities. Because Mr. Zamora was the only employee of the thirty-five problem cases to reach this juncture, one cannot determine whether he was treated differently from other employees. But one can examine the circumstances for evidence that would allow a reasonable factfinder to draw an inference of discrimination. I find none.
Mr. Zamora argues that once he produced his naturalization certificate, it should have been sufficient to clear the company of any possible liability under IRCA. Any further requests for documentation, he argues, were inconsistent with the company’s stated rationale and thus evidence of pretext. Similarly, Mr. Zamora contends that because the memorandum handed to him on May 10 stated that “eligibility can be established with ... a Certificate of Citizenship or Naturalization,” Mr. Tucker’s rejection of such a document is evidence of pretext. Lastly, Mr. Zamora argues that Mr. Tucker’s personal demeanor is evidence of discrimination. I do not find these arguments convincing for several reasons.
A.
First, Mr. Zamora ignores the critical fact that in addition to presenting Mr. Tucker with his naturalization certificate he also presented him a Social Security document that displayed a birth date different from the one he had previously reported to Elite. See Appellant’s Supp. App. at 89. This new development understandably heightened Mr. Tucker’s suspicion regarding whether the SSN used by Mr. Zamora was legitimately his. The contemporaneous presentation of a naturalization certificate, which would not contain Mr. Zamora’s SSN, would not have *1177 resolved the issue. As Mr. Tucker explained:
[M]y concern with Mr. Zamora was could I find a document or a couple of documents that had the birthdate he was using, the name he was using, and the social security number he was using that verified that this is truly his? And when he brought [in the document with the different birth date,] in addition to the other concern that had been raised with this different birthdate, it appeared to me as if now we had possibly three individuals using this same card.
Tucker Dep. at 64.
It may have been wrong, but it was not unreasonable for Mr. Tucker to believe that, under these circumstances, examination of the naturalization certificate would fail to bring the company into compliance with IRCA. IRCA makes it “unlawful for [an employer], after hiring an alien for employment in accordance with [IRCA’s hiring procedures] to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment.” 8 U.S.C. § 1324a(a)(2). Thus, Mr. Tucker may have reasonably believed that while examination of a facially valid naturalization certificate would satisfy Elite’s statutory duties at the hiring stage, see 8 U.S.C. § 1324a(a)(3), once the company was confronted with a specific question about a worker’s documentation, it was under a duty to investigate and resolve that specific concern.
Indeed, case law interpreting IRCA supports Elite in this view. The Ninth Circuit has held that 8 U.S.C. § 1324a(a)(2) adopts a “constructive knowledge standard,” whereby “a deliberate failure to investigate suspicious circumstances imputes knowledge” to an employer. New El Rey Sausage Co., Inc. v. INS, 925 F.2d 1153, 1157-58 (9th Cir.1991) (citing Mester Mfg. Co. v. INS, 879 F.2d 561, 567 (9th Cir. 1989)). As that court explained, employers share “part of [the] burden” of “proving or disproving that a person is unauthorized to work.” Id. Initial verification at the hiring stage is done through document inspection, but “[n]otice that these documents are incorrect places the employer in the position it would have been if the alien had failed to produce documents in the first place: it has failed to adequately ensure that the alien is authorized.” Id. Moreover,
[although compliance with the paperwork procedures establishes a good faith defense against a finding of unlawful hiring, 8 U.S.C. § 1324a(a)(3), it should provide no defense against a violation of section 1324a(a)(2). While the hiring can be considered in good faith since the false nature of the documents was unknown, the continuing employment is done with the knowledge that the document is false.
Id. at 1158 n. 7.
Whether or not this Court ultimately agrees with the Ninth Circuit’s interpretation — which we need not decide in this case — Neiv El Rey Sausage demonstrates that Mr. Tucker’s diligence in seeking resolution of all reported SSN discrepancies was within the bounds of reasonableness and, therefore, that his continued focus on resolving Mr. Zamora’s SSN problem does not constitute strong evidence of pretext. See Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1178 (10th Cir.2006) (“ ‘[A] mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual.’ ”) (quoting EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1322 n. 12 (10th Cir.1992)); Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir.2004) (“[I]n evaluating pretext, the relevant inquiry is not whether [the employer’s] proffered reasons were wise, fair or correct, but whether [the employer] hon *1178 estly believed those reasons and acted in good faith upon those beliefs”) (internal citations and quotation marks omitted); Reynolds v. School Dist. No. 1, Denver, 69 F.3d 1523, 1535 (10th Cir.1995) (“[A]n employer’s exercise of erroneous or even illogical business judgment does not constitute pretext.”). See also McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir.1998) (“Summary judgment is not ordinarily appropriate for settling issues of intent or motivation.... However, in this case, McKnight has not shown that at the time of his termination there was any dispute or a genuine issue concerning the sincerity of defendants’ proffered reason for his termination.”).
Mr. Zamora’s position appears to be that whenever an employer has “good” documents on file — that is, documents that facially comply with IRCA and for which questions have not been raised — the employer is barred from pursuing any suspicious circumstances that arise concerning other documents on file. As New El Rey Sausage demonstrates, IRCA does not necessarily read that way, and I do not believe an employer should be held to have discriminated under Title VII for failing to adopt this somewhat surprising reading of its responsibilities. Indeed, if any action beyond facial examination of eligibility documents is discriminatory, then the entire Basic Pilot Program — which is designed to curb the growing problems of document fraud and identity theft — might be called into question, since it is premised on the examination of data discrepancies rather than documents.
In arguing that Elite’s proffered reason is pretextual, the dissent rests heavily on a quotation from Mr. Tucker’s deposition in which he affirmatively responded to the following question: “So, it wasn’t really a concern about whether [Mr. Zamora] is entitled to work in this country, it was a eoncerp about is he using the correct social security number?” Tucker Dep. at 87. The dissent interprets this as a “concession” that Mr. Tucker “was not concerned with Zamora’s lawful right to work in this country as of May 22, 2002.” Dissenting Op. at 1191-92. The statement, however, must be understood in context:
(1) When asked what IRCA requires, Mr. Tucker stated: “Within three days of [an employee’s] working for us we have to have documents that establish, one, their identity; and two, their eligibility to work in this country. Sometimes those documents can be one and the same.” Tucker Dep. at 17.
(2) In explaining his concern over Mr. Zamora’s file, Mr. Tucker stated: “My concern with Mr. Zamora was could I find a document or a couple of documents that had the birthdate he was using, the name he was using, and the social security number he was using that verified this is truly his?” Id. at 64.
(3) With this as background, Mr. Tucker was then asked: “So would it be fair to say that the problem with the social security number is that it points to a potential that, in fact, he is not entitled to work in this country?” Id. at 87. Mr. Tucker responded: “What I had was a social security number that indicated three different people may have used that number at three different points in time. I wanted to ascertain with certainty that that number belonged to Mr. Zamora.” Id.
(4) Only then did Mr. Zamora’s attorney ask: “So it wasn’t really a concern whether he is entitled to work in this country, it was a concern about is he using the correct social security number?,” whereupon Mr. Tucker responded, “Yes sir.” Id.
Mr. Tucker never testified that he was unconcerned with IRCA compliance in general, only that his concern related to Mr. Zamora’s SSN rather than any other *1179 issues surrounding “entitlement to work in this country.” As already discussed, an increasingly common form of IRCA fraud entails the presentation of valid documents that belong to someone else. Thus, while SSNs are initially used to confirm employment eligibility under IRCA (rather than identity), when an employer learns that a Social Security number has been used by multiple persons, the employer might reasonably be concerned that an employee is not who he purports to be — in other words, that the SSN the employee presents does not match the identity he presents. Consequently, the question relevant to this case is not really one of “eligibility” under IRCA, but rather of the match between identity and proof of eligibility. In Mr. Tucker’s words: “What I had was a social security number that indicated three different people may have used that number at three different points in time. I wanted to ascertain with certainty that that number belonged to Mr. Zamora.” Id. at 64.
The dissent misapprehends the nature of Mr. Tucker’s concern, and therefore erroneously concludes that Mr. Tucker was not concerned with IRCA compliance — or more precisely, that Elite’s professed concern about IRCA compliance must be a pretext for its real motive: discrimination against persons of Mexican nationality. Mr. Tucker repeatedly explained that he was concerned with Mr. Zamora’s reported SSN discrepancy. As detailed above, a reasonable reading of IRCA suggests that when such problems are reported, an employer must resolve them. Read in context, Mr. Tucker’s statements — including his “concession”— reflect a concern with this aspect of IRCA compliance rather than an admission that Mr. Tucker was wholly unconcerned with IRCA.
The dissent objects that my interpretation of Mr. Tucker’s remark relies on its “context.” Dissenting Op. at 1185 n. 3, 1193 n. 13. It asserts that consideration of “contextual hues” will “amount to impermissible inferences drawn in favor of Elite,” and implies that on summary judgment a court must disregard such “arguments.” Id. at-. Such an approach would depart from well-established principles of Title VII law. As the Supreme Court recently explained:
[T]he significance of any given act of [employment] retaliation will often depend upon the particular circumstances. Context matters. “The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.”
Burlington N. & Santa Fe Ry. Co. v. White, — U.S.—, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (emphasis added) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). Accordingly, this Court frequently examines statements and events in context to determine their legal effect or whether they genuinely create a disputed question of material fact. See, e.g., Jones v. Barnhart, 349 F.3d 1260, 1269 (10th Cir.2003) (considering allegedly discriminatory acts and finding that, “[i]n context, these particular incidents do not appear to be founded in racial enmity”); Rakity v. Dillon Companies, Inc., 302 F.3d 1152, 1163 (10th Cir.2002) (noting the importance of viewing deposition testimony in its full context and concluding ■ that comments from one portion of a deposition were clarified by comments in another portion and therefore did not raise a genuine issue of material fact); Curtis v. Okla. City Pub. Sch. Bd. of Educ., 147 F.3d 1200, 1215 (10th Cir.1998) (finding that deposition statements, “placed in context, [did] not support Plain *1180 tiffs claim that” his employer “terminated him for no reason” and concluding that he failed to “establish[] a genuine issue of material fact”); Gross v. Burggraf Const. Co., 53 F.3d 1531, 1538 (10th Cir.1995) (viewing allegedly discriminatory comments by co-workers in “context” and affirming summary judgment for defendant); Ingels v. Thiokol Corp., 42 F.3d 616, 623 n. 4 (10th Cir.1994) (viewing a human resource director’s testimony “in context” to conclude that it did not constitute evidence of pretext in an age discrimination case), abrogated on other grounds by Nat’l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); Ambus v. Granite Bd. of Educ., 975 F.2d 1555, 1565 (10th Cir.1992) (finding that facially “disturbing” deposition testimony, “taken in context,” did not constitute the showing of bias needed to support plaintiffs due process claim); Mella v. Mapleton Pub. Sch., 152 Fed.Appx. 717, 724-25 (10th Cir.2005) (unpublished) (reading-statements in context to conclude that “no reasonable jury could construe [them] as ageist”); Shinwari v. Raytheon Aircraft Co., No. 98-3324, 2000 WL 731782, at *10 (10th Cir. June 8, 2000) (Lucero, J.) (unpublished) (“Viewing the entirety of the evidence in context, we conclude that this single isolated inconsistency is not sufficient to undermine the sincerity of Ray-theon’s professed motive for taking adverse action ....”) abrogated on other grounds by Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 269, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); Drake v. Colo. State Univ., Nos. 97-1076, 97-1077, 1998 WL 614474, at *5 (10th Cir. Sept.8, 1998) (unpublished) (finding that, “[pjlaced in context,” an employer’s statements did not constitute evidence of retaliatory motive sufficient to rebut the employer’s proffered nondiscriminatory reason).
It would be error to do otherwise. The principle that a court must resolve disputed facts in favor of the nonmoving party does not license the court to disregard undisputed facts, even regarding “context,” if those facts would preclude a reasonable jury from finding discrimination. In this case, the context makes clear — and no reasonable jury could find otherwise— that Mr. Tucker was concerned about Mr. Zamora’s Social Security number issues as part of the company’s IRCA compliance efforts. There is nothing in Mr. Tucker’s statements, read in context, that would warrant an inference that his concerns about Mr. Zamora’s SSN were a pretext for discrimination.
B.
Second, while we have held that pretext can be shown “with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances,” English, 248 F.3d at 1009, and while it is true that the memorandum issued to Mr. Zamora stated that a naturalization certificate was an acceptable form of proof of identity and employment eligibility, the memorandum also stated that “the documents you provided us previously are questionable.” Appellant’s Supp. App. at 87. According to Mr. Tucker, when he handed the memo to Mr. Zamora, he “told him through the interpreter that it appeared as if his documentation might have a problem and that he would have ten days to try to resolve the discrepancy.” Tucker Dep. at 52 (emphasis added). At his deposition, and in his complaint before the Equal Opportunity Employment Commission, Mr. Zamora admitted that “[o]n or about May 10, 2002, my manager asked me to bring again documents to prove that I had a valid Social Security number and the right to work in this country.” Zamora Dep. at 21-22 (emphasis added). Additionally, the following exchange occurred at Mr. Zamora’s deposition:
*1181 Q. Okay. And is it fair to say that you knew you needed to bring a valid Social Security number and documents to prove the right to work in this country? A. Yes.
Q. And you knew that on May 10th?
A. Yeah.
Id. at 22. Thus, although the Elite memorandum, read in isolation, might suggest some sort of inconsistency, when read in context of what was said to Mr. Zamora— and what took place in this case — it does not get Mr. Zamora very far.
C.
Third, as discussed above, the Supreme Court has held that a showing by the plaintiff that the employer’s asserted justification is false will not always be adequate to sustain a jury’s finding of liability. Reeves, 530 U.S. at 148, 120 S.Ct. 2097. The Court offered two examples of when this might be the case. One such example arises when “the plaintiff create[s] only a weak issue of fact as to whether the employer’s reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.” Id. As already noted, Mr. Zamora has, at best, created a weak issue of fact as to whether Mr. Tucker was really pursuing IRCA compliance: his attempt to resolve known SSN discrepancies was entirely reasonable under IRCA and relevant case law, and his continued insistence on resolving that problem was consistent with what Mr. Zamora was told about his need to resolve the SSN issue. But more importantly, there is a complete absence of any evidence that Elite harbored any animosity toward persons of Mexican extraction. Quite the contrary. The same employer hired other employees of Mexican descent, hired Mr. Zamora knowing he was from Mexico, told Mr. Zamora he would be rehired if he could clear up the SSN problem, and offered to rehire him immediately after verifying his documentation, a mere three days after suspending him.[10] If these actions were a pretext for discriminating against persons of Mexican nationality, it was an exceedingly peculiar way to go about it. Cf. Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 (10th Cir.2006) (“Most of the same individuals ... who decided to terminate Antonio for job abandonment had also hired her twice, fully aware of her race and national origin. It makes little sense to deduce that these individuals terminated Antonio roughly ten months later because of her race and/or national origin.”).
The Supreme Court’s second example of when evidence of inconsistency may not give rise to a finding of pretext occurs when “the record conclusively reveal[s] some other, nondiscriminatory reason for the employer’s decision.” Reeves, 530 U.S. at 148, 120 S.Ct. 2097. Here, even if we were to assume that Mr. Tucker was not simply trying to satisfy what he believed were Elite’s responsibilities under IRCA, the most that can be said of him is that he was fixated on ensuring that all of Elite’s employees had valid SSNs on file and that all reported SSN problems were resolved. *1182 Mr. Tucker’s actions throughout this process were consistent with this concern and this concern only. His first step was to check all employees’ SSNs. When problems were discovered, he pursued each and every one of them to resolution. As soon as Mr. Zamora produced adequate proof of the validity of his SSN, Mr. Tucker asked him to return to work. As already explained, these actions could be consistent with a reasonable interpretation of IRCA. But, even if they were not, they at most reveal a mistaken preoccupation with ensuring that the reported SSN problems get, resolved, not some sort of covert plan to target Mr. Zamora because of his ethnicity.
D.
Mr. Zamora also contends that Mr. Tucker’s rudeness in reacting to the demand for an apology is indicative of a discriminatory motive. But the record contains no evidence that Mr. Tucker’s reaction to Mr. Zamora’s request was related to ethnicity. As Mr. Tucker stated in his deposition — explaining why Mr. Zamora’s translator may have used strong language on Mr. Zamora’s behalf — “[f]oul language is quite common [at the Elite] organization.” Tucker Dep. at 56. “Title VII is not a general civility code for the American workplace.” Dick v. Phone Directories Co., 397 F.3d 1256, 1263 (10th Cir.2005). Rudeness does not, standing alone, demonstrate discrimination, especially in a warehouse environment where top hats and tails are not the norm. And none of Mr. Tucker’s purportedly rude behavior focused upon Mr. Zamora’s ethnicity. Indeed, before he called Mr. Zamora into his office on May 10, Mr. Tucker had never met Mr. Zamora. Tucker Dep. at 12. Mr. Tucker summoned Mr. Zamora solely to reconcile a reported SSN discrepancy, and all of Mr. Tucker’s conduct towards Mr. Zamora following that incident was based upon that discrepancy.
That Mr. Tucker suspected Mr. Zamora of some form of SSN fraud is scarcely evidence that he was bigoted against persons of Mexican ethnicity or nationality. Mr. Tucker had investigated thirty-four other employees with similar problems and none of them had been able to establish the authenticity of their SSNs. Mr. Zamora was last on the list, and it was not unreasonable for Mr. Tucker to expect that he would follow the pattern. It turned out Mr. Zamora was the exception, but that does not mean Mr. Tucker’s suspicions were a product of animus.
V.
Though I agree with Judge Ebel’s analysis for the Court as to the dismissal claim, I write to spell out an additional reason why we should affirm the district court on this front. As I understand Mr. Zamora’s theory — and that of Judge Luce-ro in dissent — the circumstances surrounding Mr. Zamora’s suspension formed the context for his termination and “it is inappropriate to ignore the former event when analyzing the latter.” Dissenting Op. at 1184. In other words, if one accepts the theory that Mr. Tucker’s previous actions with regard to Mr. Zamora’s employment status were motivated by animus toward those of Mexican descent, one must also accept that Mr. Tucker’s reaction to Mr. Zamora’s demand for an apology was similarly motivated. Mr. Tucker fired Mr. Zamora, the theory goes, not as a reaction to the ultimatum (not even as a disproportionate or even unreasonable reaction), but rather because the demand finally gave Mr. Tucker the cover he needed to rid the company of an employee he disfavored because of his national origin.
The consequences of such a holding would be stark: essentially any victim of a discriminatory adverse employment action that fell short of termination could morph *1183 his grievance into a more lucrative wrongful termination claim by presenting his employer with an ultimatum. While appropriate means for opposing workplace discrimination exist — such as internal grievance processes, the Equal Opportunity Employment Commission, or the courts — employee-fashioned ultimatums are not among them. There are a multitude of valid reasons why an employer might not issue an apology on demand, not the least of which is a reluctance to admit legal liability or moral culpability before a claim has been fully reviewed through appropriate channels. If Mr. Zamora’s theory holds, employers would face a daunting Catch-22: apologize and perhaps admit the previous violation of the discrimination laws, or fail to satisfy the ultimatum and face potentially increased liability for wrongful termination.[11] Title VII provides employees with a method of remedying acts of discrimination, not with a means of creating them.
Conclusion
For these reasons — in addition to those enunciated in Judge Ebel’s opinion, which I join — I would affirm the district court’s disposition as to both claims.

. Mr. Tucker’s deposition is found in the Appellant's Supplemental Appendix at pages 45-82. Mr. Zamora’s deposition is found in the same appendix at pages 30-44.

. The dissent claims that Mr. Zamora presented his naturalization certificate at a meeting separate and apart from the meeting at which he presented the questionable Social Security earnings report and naturalization interview notice. Dissenting Op. at 1186. The dissent does not explain the evidentiary basis for this inference. Neither Mr. Zamora nor Mr. Tucker mentioned such a meeting in their depositions.

. Mr. Tucker denied receiving a naturalization certificate from Mr. Zamora. As he described the relevant events, he called Mr. Zamora into his office on May 22 to inform him that he could not continue working at Elite until he provided the documentation requested on May 10. When asked whether Mr. Zamora brought any documents at that time, Mr. Tucker responded: "Not right then.” Tucker Dep. at 55.
Mr. Tucker explained that Mr. Zamora returned "either that day or the next,” id. at 66, with (1) "documents that were issued by the Immigration and Naturalization Service” showing that Mr. Zamora had applied for naturalization, and (2) Social Security wage records which "had the same social security number, but it had a different birthdate than the one he was using,” id. at 61. It thus appeared to Mr. Tucker "as if even a third employee or a third individual may have been using that number.” Id. When asked whether Mr. Zamora brought any other documents during that visit, Mr. Tucker responded: "It is my recollection that this is all he presented me with.” Id. at 66.
Mr. Tucker testified that his next interaction with Mr. Zamora occurred when the latter brought in a document stamped by the Social Security Administration (discussed infra ). When asked whether Mr. Zamora "brought any additional documents” to that meeting, Mr. Tucker responded: "I do not recall.” Id. at 69.
When Mr. Zamora's attorney directly questioned Mr. Tucker about the naturalization certificate, the following exchange ensued:
Q. Okay. Do you recall if [Mr. Zamora] ever brought to you a certificate of naturalization?
A. He did not.
Q. You recall that he did not?
A. Yes sir.
Id. at 90-91.

. Judge Hartz offers arguments against employing the McDonnell Douglas framework in the summary judgment context. Those arguments were not made by any party and have not received the consideration of the en banc court. Nothing in the opinions in this case should be interpreted as precluding parties in future cases from litigating the issues Judge Hartz raises.

. In a discriminatory discharge case, all a plaintiff must show is: (1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and, (4) the job was not eliminated after his discharge. English v. Colo. Dept. of Corrections, 248 F.3d 1002, 1008 (10th Cir.2001). This Circuit has held that the requirements for a prima facie case in a discriminatory suspension case are different than those for a discriminatory discharge case, a difference that perhaps gives the first step of the McDonnell Douglas framework a bit more bite in the former context. A plaintiff attempting to prove discriminatory suspension must show that (1) he belongs to a protected class, (2) he suffered an adverse employment action, and (3) “the adverse employment action occurred under circumstances giving rise to an inference of discrimination.” Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir.2002). Although the posture of this case demands that we analyze the evidence under the later stages of the McDonnell Douglas framework, with regard to Mr. Zamora’s first claim, it is not clear that he presented enough evidence to pass even this first step.

. Indeed, Mr. Tucker enunciated a concern very similar to this in explaining why he staggered distribution of the memoranda alerting employees of their reported SSN discrepancies:
[W]e knew that once we started calling these people in, not only they but others that may have had social security numbers that checked out would leave the work force and that if we had a large group of warehouse employees leave at one time, it would have been disruptive. So we set up — originally I was going to call five individuals in each week. But the first week, the first five I called in, they and about five other guys just disappeared the next day. So we slowed the process down to where we were doing like two to three every other week or so.
Tucker Dep. at 37-38.

. On December 12, 2006, Department of Homeland Security officials raided six meatpacking plants across the nation in search of illegally employed immigrants. The action resulted in the arrest of 1,282 workers' — -nearly ten percent of the targeted company’s workforce. See Rachel L. Swarns, Illegal Immigrants at Center of New ID Theft Crackdown, N.Y. Times, Dec. 14, 2006, at A3 8. “The action targeted the use of legitimate Social Security numbers by illegal immigrants — what ... [the] spokeswoman for Immigration and Customs Enforcement[ ] called 'a massive identity-theft scheme.' " Nicole Gaouette, Six Meat Plants Are Raided in Massive I.D. Theft Case, latimes.com, Dec. 13, 2006, at http://www.latimes.com/news/ nati-onworld/nation/la-na-raidl3decl3.0.5308699.story?track=rss. See also Swarns, supra (reporting the Secretary of Homeland Security’s intention to "aggressively pursue document-theft rings and the illegal immigrant workers who use them,” and reporting his statement that " 'when we remove the illegal workers, there's going to be some kind of slowdown' ").

. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104-208, §§ 401-404, 110 Stat. 3009, 3009-655 to 3009-665; U.S. Citizenship & Immigration Servs., U.S. Dep't of Homeland Sec., Repon to Congress on the Basic Pilot Program (June 2004), http: //www.uscis.gov/files/native documents/B asicFINALcongress0704.pdf [hereinafter, USCIS, Report to Congress]; Pilot Programs for Employment Eligibility Confirmation, 62 Fed.Reg. 48309, 48311 (Sept. 15, 1997) ("The Basic Pilot involves separate verification checks (if necessary) of the SSA and [USCIS] databases, using automated systems to verify Social Security account numbers ... and alien registration numbers.”). In 2006, the U.S. Senate and House of Representatives each passed differing versions of a bill that would have made the Basic Pilot Program mandatory for all U.S. employers. See Border Protection, Antiterrorism, and Illegal Immigration Control Act of 2005, H.R. 4437, 109th Cong. (2006); Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong. (2006).

.INS published the procedures for Basic Pilot in 1997. Subsequently, INS transferred from the Department of Justice to the Department of Homeland Security, where its functions are now carried out by USCIS. See 69 Fed.Reg. 75997, 75998 (Dec. 20, 2004). Thus, where the 1997 procedures refer to INS, this opinion substitutes USCIS.

. At his deposition, Mr. Zamora admitted that aside from the rejection of his papers, Mr. Tucker did nothing to suggest an animus toward Hispanics:
Q. Okay. Did Mr. Tucker tell you that he did not like Hispanic people?
A. No.
Q. Did Mr. Tucker tell you that he did not like Mexican people?
A. No.
Q. Were there other people that worked in Elite Logistics who were from Mexico?
A. Yes.
Q. And what are your reasons for believing that Elite discriminated against you because of your national origin? ...
A. Because he don't believe me that the papers that I give him was right or mine.
Zamora Dep. at 40-41.

. Moreover, if the Court were to validate Mr. Zamora's theory, it might mean that an employee could unilaterally turn every claim of discrimination under 42 U.S.C. § 2000e-(2)(a)(l) into a retaliation claim under 42 U.S.C. § 2000e-3(a), which makes it unlawful "for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice” under Title VII. 42 U.S.C. § 2000e-(3) (a).